[Civ. No. 41110. Second Dist., Div. One. Aug. 14, 1973.]

THE PEOPLE EX REL. DEPARTMENT OF PUBLIC WORKS, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and Respondent.

## COUNSEL

Harry S. Fenton, Joseph A. Montoya, Robert L. Meyer, Hugh R. Williams, Charles E. Spencer, Jr., and Ira W. Holroyd for Plaintiff and Appellant.

William E. Still and Walt A. Steiger for Defendant and Respondent.

Burt Pines, City Attorney, Robert E. Thomson, Claude E. Hilker and Peyton H. Moore, Jr., Assistant City Attorneys, Norman L. Roberts and Kenneth Cirlin, Deputy City Attorneys, as Amici Curiae for Defendant and Respondent.

## OPINION

**THOMPSON, J.**—Plaintiff (condemner) appeals from a judgment in an eminent domain proceeding awarding respondent (condemnee) the sum of

$52,750 as compensation for a strip of real property 40 feet wide by 1,350 feet long at one time used by condemnee for a railroad right-of-way. Condemner concedes the sufficiency of the evidence to support the judgment but contends: (1) the trial court prejudicially erred in ruling that the condemned property should be valued disregarding existing zoning restrictions upon it; and (2) the trial court prejudicially erred in receiving in evidence an offer to purchase the property made by the condemner. We reverse the judgment.

## Zoning

The property which is the subject of the case at bench is located in the San Fernando Valley in the City of Los Angeles. It was acquired by condemnee's predecessor in interest in 1912 and beginning in that year it was used as a railroad right-of-way. The general area through which the right-of-way ran was agricultural in character. A street subsequently to become the southbound lane of Sepulveda Boulevard in the San Fernando Valley was constructed on the west side of the right-of-way sometime prior to 1935. The northbound lanes of Sepulveda were constructed to the east of the property in 1940, at which time the roadway to the west of the property became a through street for the first time.

The property was unzoned until March 7, 1946. On that date pursuant to a master plan by which railroad rights-of-way were zoned to accord with adjoining land, the property was zoned A2-1, a zoning which permits single family residences, offices of some types in conjunction with a residence, agriculture, miniature golf courses, and public parking if necessary findings are made. From 1946 until June 29, 1970, the date of valuation in this eminent domain proceeding, the character of the area around the property changed from agricultural to urban. Sepulveda Boulevard as it adjoined the property became essentially a commercial street with no agricultural use along it. By 1970 Sepulveda was a major highway traveled by approximately 20,000 cars per day. In 1963 condemnee's predecessor in interest terminated the use of the property as a railroad right-of-way.

Although for different reasons, both related to their respective theories at trial, condemner and condemnee agree that there was at no time a reasonable probability of a zoning change of the former right-of-way strip to C2 & P, commercial and parking, which condemnee contends was necessary to the development of the land to its highest and best use.

An appraiser, whose qualifications to testify to the value of real property were stipulated, testified for condemnee without objection, that where dis-

continued railway rights-of-way existed as median strips of highways, it was the policy of the City of Los Angeles either to acquire them or to prevent their development. His opinion was based upon two factors: ordinances of the City of Los Angeles in existence from 1956 through 1966 which restricted the use of former railroad rights-of-way, and the action of the city in an unrelated situation "rolling back" zoning of a former right-of-way to a more restrictive use. The first of the ordinances recites: "Because of the location, shape, size and necessity for transportation and the movement of traffic of certain abandoned right-of-way properties, any other use not related to transportation or the movement of traffic would be contrary to the public interest and hazardous to public health, safety and general welfare." The enactment provides in part that "no person shall erect any building or structure on property within any railway right-of-way where railway service has been discontinued within two years after such abandonment or such discontinuance. . ." In 1957 the city by ordinance extended the period to six years from the effective date of the new ordinance. The third ordinance enacted in 1960 extended the period to 1966. Except to the extent of the prohibitions upon development for the specified periods the ordinances permitted the use of abandoned railway right-of-way to the extent "not contrary to the public interest" nor "hazardous to the public health, safety, and general welfare" if the use comported with the zoning applicable to the right-of-way.

In 1971 the City of Los Angeles in rezoning an unrelated abandoned right-of-way owned by condemnee to a more restrictive (residential) use, reported: "In initiating the change of zone, the Council indicated that it would be desirable to eliminate all possibility of extensive use of the railroad right-of-way which along a good portion of its length occupies the center portion of a secondary highway."

Condemner produced evidence that it was the policy of the City of Los Angeles to restrict zoning of discontinued railroad rights-of-way only to the extent of elimination of traffic hazards and "in the interest of the public health, safety and welfare." The parties agreed at trial that there was no cooperation or agreement between the City of Los Angeles and the condemner, State of California, to limit the use of the subject strip of property so as to allow condemner to acquire it for less than its market value.

The trial court found, "there appears a city policy to prohibit or frustrate the use of abandoned railroad rights-of-way other than for street purposes" and concluded, "the City's refusal to rezone subject property to commercial amounts to a taking without just compensation, which

renders the present agricultural zoning into which subject property has been frozen discriminatory, confiscatory and invalid." The trial court ruled: "1. That upon the trial of this action the parties may offer evidence of the fair market value of subject property as though its use were unrestricted by zoning ordinance. ¶2. That all evidence of the fair market value of the subject property based in whole or in part upon its present zoning be excluded at trial."

Condemnee having offered and the court having received evidence that the property should be valued at its highest and best use as commercial property, condemner on this appeal attacks the finding of improper purpose for the A2-1 zone as being unsupported by the evidence and the ruling excluding consideration of the zoning as being contrary to law.

■ Substantial evidence supports the finding of the trial court that the zoning applied by the City of Los Angeles to the subject property was the implementation of a city policy to frustrate by discriminatory spot zoning development of discontinued railroad rights-of-way for other than street purposes. The trial court was entitled to accept the actual recitals in the 1956 through 1966 ordinances and in the "roll back" zoning matter as controlling over the protestations to the contrary of the city officials who testified for condemner.

The existence of evidentiary support for the trial court's finding is not the end of the matter. Its legal conclusion barring evidence of actual zoning, must be tested. ■ Although in most situations a collateral attack upon zoning is not permitted in an eminent domain proceeding (see Note 9 A.L.R.3d 291, 303 and cases there cited), that principle is inapplicable to the situation where the condemner purporting to exercise its police power by enacting a zoning ordinance has in reality discriminated against a particular parcel or parcels of land in order to depress their value with a view to future takings in eminent domain. (4 Nichols on Eminent Domain (3d ed.) § 12.322; Note 9 A.L.R.3d 291, 304 and cases there cited; see also *Klopping* v. *City of Whittier,* 8 Cal.3d 39, 46 [104 Cal.Rptr. 1, 500 P.2d 1345].) In such a situation the condemnee may attack the validity of the invalid zoning ordinance in the eminent domain action and if successful require that his property be valued free of its restrictions. (See *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39.)

Thus, if the eminent domain action which is the case at bench had been commenced or prosecuted by the City of Los Angeles, the ruling of the trial court excluding evidence of existing zoning would have been correct. (*Peacock* v. *County of Sacramento,* 271 Cal.App.2d 845, 856 [77 Cal.Rptr.

391]; *Sneed* v. *County of Riverside,* 218 Cal.App.2d 205, 209-211 [32 Cal.Rptr. 318]; *Kissinger* v. *City of Los Angeles,* 161 Cal.App.2d 454, 458-460 [327 P.2d 10].) ■ The case at bench, however, involves an improper zoning restriction imposed by the City of Los Angeles for the purpose of depressing value with a view to future condemnation and actual condemnation by a different governmental agency, the State of California. Moreover, there is an express concession by the parties that the city's action was not taken in concert or by agreement with the state.

The distinction between the governmental entity imposing the improper restriction in the guise of zoning and the governmental unit taking property for which the constitution demands it pay just compensation creates the critical problem in the case at bench. ■ A zoning restriction imposed to depress value with a view to future eminent domain proceedings itself creates a cause of action in inverse condemnation against the governmental unit enacting the zoning ordinance. (*Peacock* v. *County of Sacramento, supra,* 271 Cal.App.2d 845; *Sneed* v. *County of Riverside, supra,* 218 Cal.App.2d 205.) The zoning restriction may be invalidated by a direct attack. (*Kissinger* v. *City of Los Angeles, supra,* 161 Cal.App.2d 454.)

It is practical and logical to require that such invalid zoning be disregarded where the zoning authority is also the condemner. Permitting recovery in eminent domain disregarding the zoning restriction combines in one action the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property. The process avoids separating the matter into two causes involving the same subject matter and the same parties. Moreover, the condemning authority is also the zoning government so that much of the vice of a collateral attack on zoning in the usual eminent domain proceeding is not present.

In contrast, logic dictates that the combination of causes of action is improper in the case at bench. To require that the city's zoning which was an inverse condemnation by that body be disregarded here shifts the financial burden of the disguised taking from the city to the state. It permits a condemnee which failed to pursue its remedies for inverse condemnation against the city to recover compensation from an entity not directly responsible for the damage compensated. ■ It is damage to the condemnee and not benefit to the condemner that is recoverable. (1 Orgel on Valuation Under Eminent Domain (2d ed.) § 94.) Since the condemnee has its rights of recovery against the city, there is no compelling need that the same damage be compensated in the eminent domain proceeding brought by the state.

A realistic approach is to treat the existing zoning as a factor bearing on valuation in the sense that it would be considered by a willing buyer and willing seller of the property and to also consider the potential invalidity of the zone as evidence of the reasonable probability of a zoning change, another factor to be considered by the theoretical willing seller and purchaser. The one California case found by us which bears on the problem takes that approach, albeit somewhat summarily. In *People* ex rel. *Dept. of Public Works* v. *Graziadio,* 231 Cal.App.2d 525 [42 Cal.Rptr. 29] the State of California planned to acquire a strip of property for a highway. The defendant owned 9.503 acres of property in Fullerton along the potential route all but the westerly 1.23 acres of which was zoned R-1 but designated "potential C-1 zoning." Defendant applied for C-1 zoning of his property. The State Department of Public Works by letter notified the City of Fullerton that the highway route would include a portion of defendant's property and requested that the property be left zoned R-1, a more restrictive zoning than C-1. The City Planning Commission zoned the portion of the property designated for the highway taking as R-1 and rezoned the remainder C-1. In an ensuing eminent domain action evidence of the R-1 zoning was offered by the state and received by the court while evidence of the letter from the Department of Public Works was excluded. The Court of Appeal stated "The R-1 zoning was properly admitted in evidence since it has a bearing upon the possible uses of the property." It held also, although finding the error not prejudicial, that the trial court erred in excluding evidence of the communication from the Department of Public Works because that evidence was relevant to the issue of reasonable probability of change in zoning. (But cf. *Board of Com'rs. of State Inst.* v. *Tallahassee B. & T. Co.* (Fla. 1958) 108 So.2d 74.)

Although the parties in the case at bench have excluded the issue of reasonable probability of change in zoning as affecting market value, *Graziadio* is highly persuasive. In an eminent domain proceeding prosecuted by the State of California, that decision permits consideration of a zoning restriction imposed by the City of Fullerton which would have been barred from evidence had the condemnation been brought by the city. The trial court's ruling in the case at bench excluded that precise form of evidence. ██ We thus conclude that the ruling was erroneous. Since the ruling materially impaired the condemner in its presentation of evidence of a lower value of the subject property it was prejudicial, and the case at bench must be reversed.

The trial court erred in another respect. It received over objection evidence of an offer to purchase the subject property made by condemner in the course of settlement negotiations.

During the course of negotiations for the purchase of the subject property by condemner from condemnee, a right-of-way agent, noting disagreement as to value and the prospect of filing an action, offered to purchase the property for $51,452. The offer not having been accepted the eminent domain proceeding was filed. At trial condemnee offered the letter in evidence. It was received over the objection of condemner that it was an offer of compromise barred by Evidence Code section 1152. The trial court instructed the jury, however, ". . . This letter was received not as evidence of value or for any suggestion arising from a mere offer to compromise because an offer to compromise is not material and may not be considered by you except as an admission on the part of the Division of Highways that, at the time the offer was made, it had an opinion as to the market value of the property. It should not be regarded as being an expression of the present opinion of the Division of Highways as to the market value of subject property as of the date of evaluation. The law favors compromises and settlements, and the offer to pay a claim made to defendant by an agent of the state may not be considered by you to be an admission by the state of liability to pay that amount, or any other sum for the subject property. . . ."

Condemner asserted at trial that the value of the property was $500 while condemnee contended for a valuation of $106,000. The jury found the value to be $52,750, some $1,300 more than the offer of compromise and a figure midway between the contentions of value made by the parties.

Evidence Code section 813 provides that in an eminent domain proceeding value of property may be shown only by opinion testimony. Sections 814 through 821 state factors upon which the opinion may be based. Evidence Code section 822 states: "Notwithstanding the provisions of Sections 814 to 821, the following matter is inadmissible as evidence and is not a proper basis for an opinion as to the value of property: . . . (b) The price at which an offer or option to purchase or lease the property . . . being valued . . . was made . . . except that an option, offer, or listing may be introduced by a party as an admission of another party to the proceeding; but nothing in this subdivision permits an admission to be used as direct evidence upon any matter that may be shown only by opinion evidence under Section 813."

Evidence Code section 1152 states: "(a) Evidence that a person has, in compromise . . . offered . . . to furnish money or any other thing

. . . to another who has sustained . . . or claims that he has sustained . . . loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it."

There is an inherent conflict between Evidence Code sections 822 and 1152 if each is construed to its broadest scope. An offer to purchase property which is about to become the subject of an eminent domain proceeding could be an offer by a party within the meaning of section 821 and admissible as a limited admission although made in the course of settlement negotiations. Section 1152 would bar such evidence.

■ The two sections are reconcilable only if offers in the course of efforts to settle eminent domain proceedings are treated as any other settlement offers and barred from evidence by section 1152. (Carlson, *Statutory Rules of Evidence for Eminent Domain Proceedings,* 18 Hastings L.J. 143, 156; A Study Relating to Evidence in Eminent Domain Proceedings, 3 Cal. Law Revision Com., Rep. (1961) pp. A-11, A-44.) Policy considerations compel the same result. ■ Where evidence is generally inadmissible based upon strong public policy, it is admissible pursuant to an exception to the generality only if its probative value outweighs the policy considerations for its exclusion. (Jefferson, Cal. Evidence Benchbook, § 21.1.) ■ Offers of compromise and statements made in the course of settlement negotiations are barred from evidence to promote the high public policy of encouraging settlement of lawsuits including those in eminent domain. (A Study Relating to Evidence in Eminent Domain Proceedings, *supra,* p. A-44.) Conversely, the evidentiary effect of an offer to purchase property made by a party to an eminent domain proceeding is so circumscribed by the statutory restrictions of Evidence Code section 813 as to give it little probative value.

■ We thus conclude that the trial court erred in receiving evidence of condemner's offer in compromise to purchase the subject property. Since we reverse on another ground, we need not determine whether the trial court's instruction prevented the error from being prejudicial.

### Disposition

The judgment is reversed. Respondent to recover costs on appeal.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied September 7, 1973, and respondent's petition for a hearing by the Supreme Court was denied October 31, 1973.